IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br><br><br><br>　　　　vs.<br><br><br><br>RUDOLFO FARIAS MAGANA,<br><br>　　　　Defendant. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS<br><br><br><br><br>Case No. 2:05-CR-524 TS |

## I.  INTRODUCTION

This matter is before the Court on Defendant's Motion to Suppress evidence found in a vehicle.  A traffic stop must be based on an objectively reasonably articulable suspicion that a traffic violation has occurred and may not be extended beyond its scope without consent or reasonable suspicion that the driver is engaged in illegal activity.  But a driver must show that he has standing before he may object to a subsequent search of the stopped vehicle.  Defendant contends that he was stopped illegally, that he has standing to object to the search because he borrowed the vehicle, that he did not consent to the search, and that if he did, the scope of the search exceeded the consent.  The Court finds that the initial stop was valid.  Because the Court also finds that Defendant failed to

1

show a linkage between the person he says loaned him the vehicle and its registered owner, he lacks standing to object to the search and the Court will deny the Motion.

## II.  FINDINGS OF FACT

On July 6, 2005, at approximately 9:25 a.m., a Utah Highway Patrol sergeant was patrolling Interstate 70 near Richfield, Utah.  The sergeant is a 38-year veteran with the Highway Patrol.  He has extensive experience with and training in drug trafficking and drug pipelines.  In addition to taking many classes on these and related subjects, he has also taught these subjects to other law enforcement officers in other states.

On July 6, 2005, the officer was sitting in a crossover on a level stretch of I-70 when he noticed a line of five cars.  The cars were traveling at approximately 70 miles per hour. He noticed the last car was following only three car lengths behind, a distance he considered to be unsafe.  In his experience and training, approximately seven car lengths behind was a safe distance at that speed.

The sergeant followed the car and as he caught up and drove along side it, the sergeant identified the driver as a Hispanic male, who appeared to be traveling alone.  The car moved into the left lane as the sergeant caught up to him.  The sergeant dropped behind him, activated his lights and parked behind him when the driver pulled over and stopped.

The sergeant approached on the passenger side.  He leaned in the side window to speak to the driver.  He asked to see his driver's license and told him that he had been following too closely.  As the driver handed the sergeant his California driver's license, the sergeant noticed that the driver's hand trembled.  The sergeant asked the driver if the

2

vehicle belonged to him.  The driver said it was a friend's car.  The sergeant asked the name of the friend, and the driver said he could not remember.  The driver handed him a registration in the name of a woman from Anaheim, California.  The sergeant asked a second time about the owner's name.  The driver again said he did not remember.  When asked where the friend lived, the driver said it was Anaheim.  In the Sergeant's experience, a vehicle registered to an absent third-party can be an indicator of illegal activity, such as drug smuggling.

The sergeant noticed other things that made him suspicious.  There was strong odor of air freshener in the car.  There was one air freshener hanging from the gearshift selector, a can of deodorizer on the floor of the passenger side and a device on the dashboard.  When the sergeant inquired, the driver said the device was also an air freshener.  There were also two cell phones that were turned on.  In the sergeant's training and experience, multiple cell phones are indicative of drug smuggling.  The sergeant testified that smugglers will often give the driver of a vehicle transporting drugs a cell phone with a pre-set number so the driver can punch one number to alert the smugglers that he has been stopped by the police.  In such a situation, the driver may also have his or her own cell phone, resulting in two cell phones.  The sergeant asked the driver his travel plans and the driver said he was going from Newport Beach, California to Colorado to look for a job as a waiter.  The sergeant found it suspicious that the driver did not know the name of the friend whose car he was driving from California to Colorado. The sergeant also thought the answer was implausible because he believed there would more opportunities to be a waiter in Newport Beach than in Colorado.

The sergeant took the papers back to the patrol car to run a criminal history on the driver, and a check to see if the vehicle was stolen and was registered to the person shown.  He was told that it was a valid California driver's licence, the registration checked out and the car was not reported stolen.  He did know, however, that due to the volume of stolen cars in California, cars stolen in that state are not listed on the NCIC for 72 hours.  The sergeant was told that there was no criminal history for the driver.

The sergeant prepared a warning citation for following too closely.  He delivered the warning to the driver, returned his licence and registration to him and began to ask him questions.  He asked if there was anything illegal in the car and the driver replied "no."  He asked if there were any drugs or guns, and the driver replied "no." He then asked the driver, "Would you care if I made a search of the car?"   The driver replied, "sure" and then said "if you're really quick."   The sergeant said it "won't take long," but neither person specified how long the search could take.

The consent to search was given approximately ten minutes after the initial stop.  It is undisputed that it was broad daylight, on an interstate freeway, and the sergeant did not raise his voice, display his weapon, or touch the driver.

After receiving the consent to search, the sergeant asked the driver to step outside and open the trunk, which he did.  The sergeant patted him down for weapons, and directed him to stand in the barrow pit.

The sergeant searched the trunk and a suitcase he found there.  He then moved to the interior where he noticed the door panels were smeared with a greasy substance, or glue.  Based on his experience he suspected drugs in the door panels, that the car had

4

previously been used for drug smuggling, or that the substance had been intentionally left there as a decoy to distract an officer from searching other places in the vehicle.  As he examined the doors, he noticed the driver appeared to become nervous, so he called for backup so he could search further with another officer to keep an eye on the driver.  The call for backup occurred approximately 16 minutes into the search.  It took about ten minutes for the two backup officers to arrive.

When they arrived, the sergeant briefed them on his suspicions about the doors and told them that the car was loaded with air fresheners.  As they were discussing the door panels, the driver commented to one officer that he didn't want the car damaged. The sergeant responded "we won't."

The driver then said something else.  The sergeant asked the other officer what the driver said and one of the back up officers told him, "He says he is hungry, he wants to go."  The sergeant testified that by this time, the greasy substance on the door, together with the other circumstances, especially that it was a third-party vehicle where the driver didn't know the owner's name, led him to believe that there was criminal activity, specifically drugs.

The driver again expressed concern about damage to the car, the sergeant again said no damage had been done.  The driver said if they did damage the car, they would have to pay, and the sergeant said they would.  He then remarked: "it is not your car anyway."  The driver responded, "but I am using it."  The sergeant asked him about documentation authorizing his use of the vehicle, and remarked, "you don't even know his name."  The driver reiterated that he borrowed the car, the sergeant again asked the

friend's name and the driver responded with a man's name.  The sergeant said that was not the name of the registered owner and that the registered owner was a female.  The sergeant remarked that the vehicle might be stolen and told the driver that the officers may seize the car to determine if it were stolen.  The driver returned to the subject of possible damage from the search and the sergeant continued to deny damage.   The sergeant eventually showed the driver existing damage in the trunk to show him that he had not damaged the trunk.

One of the backup officers found a document from a California prison indicating that the driver had been recently released.  He asked the driver about it and the driver admitted having served several years for transporting methamphetamine.  The sergeant then knew that the information he had obtained from dispatch had been partially incorrect.

In the meantime, the other backup officer noticed that screws around the dash were marked up, indicating that they could have been taken out and replaced several times.  In the sergeant's training and experience, the marked-up screws and air fresheners could indicate drugs hidden in the dash.  The backup officer removed several screws and pulled the molding back and asked the sergeant to look at it.  The sergeant peered in and saw shrink-wrapped packages.  He used a tool to pry open the area.  When the prying sliced a shrink-wrapped package, the officers smelled coffee grounds, commonly used to mask the smell of drugs.  The sergeant then formally arrested the driver, the defendant herein.

### III.  DISCUSSION AND CONCLUSIONS

Defendant contends that the initial traffic stop was invalid, that the length of the detention was  unreasonable, and that the scope of the consent was exceeded in its length

6

of time and as to damage caused.   The government contends that defendant lacks standing to object to the search, that the traffic stop was based on reasonable suspicion, the length of the detention was reasonable, that the encounter after the return of the documents was consensual, that the scope of the search did not exceed that consent, and that if it was not consensual, it was based on reasonable suspicion developed during the first part of the stop, or probable cause developed during the search.

A. Standing

The government contends that Defendant lacks standing to object to the search of the vehicle because he did not present evidence that he had lawful possession or control of the vehicle.   Defendant contends he has standing because he was given the car by its legal owner to drive from Anaheim.

> To establish standing to challenge a car search, the defendant bears the burden of showing that he had a legitimate possessory interest in or a lawful control over the car.   Because the focus of the inquiry is on reasonable expectations, however, a defendant need not submit legal documentation showing a chain of lawful custody from the registered owner to himself.   In resolving standing issues of this type, we consider important, but not determinative, the following factors: (1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle.[1]

> The standing inquiry focuses on reasonable expectations, hence, a defendant is not required "to produce legal documentation showing a chain of lawful custody from the registered owner' to himself."   In *Rubio-Rivera,* the "defendant satisfied the requirement that he 'must at least state that he gained possession from the owner or someone with the authority to grant

---

[1] *United States v. Valdez Hocker,* 333 F.3d 1206, 1209 (10th Cir. 2003).

possession'" when he testified the owner directed him to "papers" in the glove box indicating ownership.

Here, [defendant] introduced evidence that he had a reasonable expectation of privacy in the vehicle when he stated he received permission from the owner to use the truck. In addition, he produced a Pennsylvania insurance card which identified the individual he named as the owner of the truck. Trooper Miller testified the dispatcher confirmed that the individual on the insurance card was the owner of the truck. "Where the defendant offers sufficient evidence indicating that he has permission of the owner to use the vehicle, the defendant plainly has a reasonable expectation of privacy in the vehicle . . . "[2]

In the present case, although Defendant initially told the officer that the vehicle belonged to a friend, he twice claimed not to remember the friend's name.  He did know the friend lived in Anaheim, where the car was registered.  Subsequently, he then told the officers that he had borrowed the vehicle from his friend who was "using it," remembered the name of the friend, but he still did not know who the registered owner was.  There is no evidence linking the friend to the registered owner or that the registered owner gave permission.

In a similar case, *Betancur*,[3] the Tenth Circuit held that a defendant had failed to show he had an expectation of privacy in a vehicle where he claimed that an individual gave him a pickup, but failed to present evidence either establishing ownership in that individual or showing linkage between that individual and the record owner.[4]  The case

---

[2]*United States v. Orrego-Fernandez,* 78 F.3d 1497, 1502 (10th Cir. 1996) (quoting *United States v. Rubio-Rivera,* 917 F.2d 1271,1275 (10thCir. 1990)).

[3]*United States v. Betancur*, 24 F.3d 73 (10th Cir. 1994).

[4]*Id.* at 77 (collecting cases); *see also United States v. Cardenas*, 24 Fed. Appx. 890, 892-93 (10th Cir. 2001) (unpublished Order and Judgment holding that defendant failed to meet his burden of showing that either the owner loaned him the vehicle or that

relied upon by Defendant, *Benitez-Arrreguin*,[5] is distinguishable because it involved an expectation of privacy in a bag, based on asserted bailment and predates the more recent case law addressing the standing of non-owner drivers of vehicles to object to a search.

*Betancur* was distinguished in *Valdez Hocker*,[6] because the defendant therein had met his burden of showing a reasonable person would have assumed the lawful possession by the non-owner who loaned him the car.[7]   That distinguishing evidence included the following: the fact that the defendant therein was not affirmatively aware that the individual who loaned him the vehicle was not the registered owner; testimony that the individual who had lent him the vehicle kept the vehicle at her house and used it as her own in the time preceding its loan; and that the defendant also personally knew the registered owner.[8]

In this case, as in *Betancur,* Defendant "failed to carry his burden of establishing a reasonable expectation of privacy in the [vehicle] by showing either ownership or lawful possession."[9]   Similarly, as in *Betancur*, although Defendant has not established "Fourth Amendment interests sufficient to challenge the search" of the vehicle, the Court must

---

a linkage existed between the person who lent him the vehicle and the owner).

[5]*United States v. Benitez-Arreguin*, 973 F.2d 823 (10th Cir. 1992) (standing to object to search of bag where defendant met his burden of showing a possessory interest in bag through bailment).

[6]*Valdez Hocker*, 333 F.3d 1206 (10th Cir. 2003).

[7]*Id*. at 1210-11.

[8]*Id*.

[9]*Betancur*, 24 F.3d at 77.

nonetheless still "consider whether the initial stop was proper" because a vehicle's driver may challenge his traffic stop as a detention, regardless of whether he has an expectation of privacy in the vehicle.[10]

B.   Validity of Initial Traffic Stop

The parties agree that this traffic stop was a seizure.  They also agree that such a seizure does not violate the Fourth Amendment if it "is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."[11]   Under Utah law:

> (1) The operator of a vehicle:
>       (a) may not follow another vehicle more closely than is reasonable and prudent, having regard for the:
>             (i) speed of the vehicles;
>             (ii) traffic upon the highway; and
>             (iii) condition of the highway; and
>       (b) shall allow sufficient space in front of the vehicle to enable any other vehicle to enter and occupy the space. [12]

Defendant relies upon the *Gregory*[13] case for authority that when the vehicle was about to pass the car ahead, an isolated incident of following too closely does "not give rise to a suspicion of criminal activity."[14]   The Court agrees with the government that *Gregory* is distinguishable.  Unlike the present case, *Gregory* involved a single isolated instance of

---

[10]*Id.* (citing *United States v. Erwin*, 875 F.2d 268 (10th Cir. 1989)).

[11]*United States v. Laughrin,* 438 F.3d 1245, 1247 (10th Cir. 2006) (quoting *United States v. Callarman,* 273 F.3d 1284, 1286 (10th Cir. 2001)).

[12]Utah Code Ann. § 41-6a-711.

[13]*United States v. Gregory*, 79 F.3d 973 (10th Cir. 1995)

[14]*Id.* at 978.

a vehicle moving into the right shoulder of the roadway, on winding, mountainous terrain when there were high winds.  In contrast, in the present case the road was level, traffic was light or moderate, and the weather was clear.

The Court finds and concludes that this case is more analogous to the *Vercher* case relied upon by the government.[15]  In *Vercher*, as in the present case, there is nothing in the record to demonstrate that there was any reason preventing Defendant  from maintaining a safe distance.  Even if, as Defendant argues, he might have been about to pass other cars, there is nothing in the record to demonstrate a reason he could not have maintained a safe distance before moving into the passing lane.

This Court is not called upon to determine if there was, in fact, a violation of the Utah statute regarding following too close, only whether the "facts were adequate to form an objectively reasonable suspicion"[16] that the statute was being violated.  The record is undisputed that the sergeant observed Defendant following three car lengths behind another vehicle and that in the sergeant's training and experience such distance was unsafe at the speed the vehicles were traveling.  Based on the record, the Court finds that the government has shown that the "totality of the circumstances suffice to form a particularized and objective basis"[17] for the traffic stop and that the sergeant had "a

---

[15]*United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004).

[16]*Id.* at 1260; *United States v. Edgerton*, 438 F.3d 1043, 1047 (10th Cir. 2006) ("While something more than a hunch of wrongdoing is necessary, the level of suspicion required to support a traffic stop is considerably less that proof of wrongdoing by a preponderance of the evidence.") (internal citation and quotation omitted).

[17]*Vercher*, 358 F.3d at 1261.

reasonable articulable suspicion that a traffic . . . has occurred."[18]   Therefore, the initial

traffic stop did not violate the Fourth Amendment.

B.  Validity of Detention Before Return of Documents

The parties also agree that the length of the detention is analyzed under the well

know *Terry*[19] stop standard.  Where, as here, the initial traffic stop is reasonable at its

inception, "[u]nless the officer has an objectively reasonable suspicion that illegal activity

unrelated to the stop has occurred, or the driver otherwise consents to the encounter, the

resulting detention is reasonable only so long as the officer's subsequent conduct is

reasonably related in scope to the circumstances which justified the initial stop."[20]

The Court finds that the initial stop was reasonably related in scope to the

circumstances which justified the initial stop.  Further, so long as the questions do not

extend the length of the detention, "there is no Fourth Amendment issue with respect to

the content of the questions."[21]

> It is well-established that "[a] law enforcement officer conducting a routine
> traffic stop may request a driver's license and vehicle registration, run a
> computer check, and issue a citation."  Moreover, we have held that during
> the stop, an officer may ask routine questions about the driver's travel
> plans.[22]

---

[18]*Laughrin,* 438 F.3d at 1247.

[19]*Terry v. Ohio*, 392 U.S. 1, 19-20 (1968).

[20]*Edgerton*, 438 F.3d at 1047.

[21]*United States v. Wallace*, 429 F.3d 969, 974 (10th Cir. 2005).

[22]*U.S. v. Bradford,* 423 F.3d 1149, 1156-57 (10th Cir. 2005) (quoting *United States v. Elliott,* 107 F.3d 810, 813 (10th Cir. 1997)).

The officer may also run a background check to check for warrants or the driver's criminal history "even thought the purpose of the stop had nothing to do with such prior criminal history."[23]  The Court finds that the length of this initial detention, approximately eight to ten minutes, was reasonable and did not violate the Fourth Amendment.

C.   Consent to Search and Probable Cause

Having determined that the traffic stop was valid and that Defendant lacks standing to object to the search of the vehicle, in the alternative, the Court finds that there was consent to search, that the scope and duration of the consent was not exceeded, and that by the time the Defendant arguably limited or withdrew his consent, there had developed probable cause to search.

1.   Consent

"The government bears the burden of proving voluntary consent based on the totality of the circumstances."[24]

> A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer.  Whether an encounter can be deemed consensual depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter. An officer is not required to inform a suspect that she does not have to respond to his questioning or that she is free to leave.  An unlawful detention occurs only when the driver has an "objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her own way.[25]

---

[23]*United States v. Holt*, 264 F.3d 1215, 1221 (10th Cir. 2001).

[24]*United States v. Gregoire,* 425 F.3d 872, 879 (10th Cir. 2005).

[25]*Bradford,* 423 F.3d at 1158 (citations and quotations omitted).

It is undisputed that the Sergeant returned all of Defendant's paperwork together with the warning ticket.  Such a return of paperwork is relevant to, but not conclusive on the issue of consent.

> We follow "the bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to [her]." The return of a driver's documentation is not, however, always sufficient to demonstrate that an encounter has become consensual. A routine traffic stop becomes a consensual encounter once the trooper has returned the driver's documentation so long as a reasonable person under the circumstances would believe [he or she] was free to leave or disregard the officer's request for information.[26]

In the present case, the Court finds upon the totality of the circumstances that a reasonable person would have felt free to leave or to refuse the Sergeant's request to search after his paperwork was returned to him.  As noted above, it was broad daylight on an interstate, the driver's paperwork and licence were returned, the officer did not raise his voice, touch Defendant, and only one officer was present when the request was made. Having considered the entire record, including the videotape of the stop, the Court finds that Defendant's consent to search was voluntary and uncoerced.

Defendant contends that the scope and duration of the consent was exceeded. There was no limitation on the scope of the consent to search.  There was arguably a limitation on the duration of the consent in the exchange where the Defendant requested that it be quick and the officer replied that it wouldn't take long.

---

[26]*Id*. at 1158 (internal citations and quotations omitted).

The Court examines the issue of whether the search exceeded the scope of the consent as to duration "from the perspective of what a reasonable innocent person would perceive."[27]

> The scope of a search "is generally defined by its expressed object and is limited by the breadth of the consent given."  The expressed purpose of the search, to which [the defendant] consented, was to look for drugs or contraband. That certainly implies that the officer could look wherever drugs might be hidden.
>
> * * *
>
> The defendant never objected to the duration of the search and never demanded to be present in the vehicle during the search.  Thus, his consent was reasonably interpreted by the officer to proceed as he did.[28]

In the present case, the officer's questions made it clear that he was requesting to search for guns and drugs.  The consent thus implied that the officer would search where such items might be hidden.[29]   The time between the start of the search and the call for backup officers was approximately 16 minutes and it was approximately 10 minutes later that they arrived.  During that time the Defendant did not object to the duration of the search or otherwise limit its scope.  Thus, Defendant's consent was "reasonably interpreted by the officer to proceed at he did."[30]

---

[27]*United States v. Gregoire*, 425 F.3d 872, 8880-81 (10th Cir. 2005).

[28]*United States v. Ramstad*, 308 F.3d 1139, 1146 -1147 (10th Cir. 2002); (citing *United States v. Elliott,* 107 F.3d 810, 814-15 (10th Cir. 1997)).

[29]*Id*. and *Gregoire*, 425 F.3d at 880 ("A reasonable person would expect more than a cursory view of the vehicle if the trooper were looking for contraband.").

[30]*Id*. at 1147.

2.   Probable Cause

The only remark that can be interpreted as a limitation on the duration was made approximately two minutes after the backup officers arrived: "he says he wants to go."  In the meantime, however, the sergeant had discovered something that, combined with the totality of the circumstances, gave him probable cause to continue the search–the greasy or glue-like substance on the door.

"It is well established that although probable cause to search a car may not exist when a car is first stopped for a traffic citation, it can arise during the course of the stop."[31] "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence."[32]

The government argues that the circumstances present during the initial traffic stop provided probable cause for the search.  The Court need not determine that issue due to the consent to search.  The Court finds that at the time of the arguable withdrawal of the consent to search there was probable cause to search based on the following factors: Defendant had two cell phones turned on.  There was a strong smell of air freshener in the vehicles with three air fresheners or devices in a small enclosed space.[33]  Defendant was driving on a long trip, from California to Colorado, in a vehicle that belonged to a third-

---

[31] *U.S. v. West,* 219 F.3d 1171, 1178 (10th Cir. 2000).

[32] *United States v. Bradford*, 423 F.3d 1149, 1159 (10th Cir. 2005) (*quoting United States v. Downs*, 151 F.3d 101, 130 (10th Cir. 1998)).

[33] *West*, 219 F.3d at 1178-79 (10thCIr. 2000) ("Tenth Circuit has consistently held that the scent of air freshener is properly considered as a factor in the probable cause analysis.").

party, when he did not know the name of the third-party owner.[34]   In the officer's training and experience, each of these circumstances, multiple cell phones, heavy use of air fresheners, and a third-party vehicle, was an indication of drug trafficking.  When he found the greasy or glue substance on the door, it was an indication of possible present or past use of the door for drug smuggling, or in the officer's experience, an attempt to deflect attention away from other areas containing hidden drugs.  All four of these factors present in a single stop created a totality of the circumstances would justify a reasonable officer in believing that there was a fair probability that the car contained contraband or evidence.  The Court finds that after the discovery of the greasy or glue-like substance on the door, probable cause arose for a search and there is no Fourth Amendment violation.

## IV.  ORDER

Based on the foregoing, it is therefore

ORDERED that Defendant's Motion to Suppress (Docket No. 12) is DENIED.  It is further

---

[34]As noted above, even when Defendant subsequently proffered a name, it was not the name of the registered owner and he offered no linkage between that person and the registered owner.

ORDERED that the time from the filing of the Motion to Suppress through the date of the new trial setting is excluded from the computation of the Speedy Trial Act time pursuant to 18 U.S.C. § 3161(h)(1)(F) and (J).

DATED  April 13, 2006.

BY THE COURT:

_____
TED STEWART
United States District Judge